*The following cases, embracing a few of the decisions at Pittsburg, September Term, 1828, and the whole of those at Chambersburg, in September Term, of the same year, were prepared for the press by Mr. Sergeant, who intended to publish them in the closing volume of Sergeant & Rawle's Reports. They were found, however, too numerous to be introduced into the Seventeenth Volume, and too few to form a separate one; a place is, therefore, given to them in the present volume.*

———◆———

[PITTSBURG, SEPTEMBER 9, 1828.]

## ALEXANDER and another *against* KERR.

### IN ERROR.

An action on the case will lie for injury to land, however inconsiderable, which is occasioned by a nuisance.

A. erected a mill and dam upon his own land, lying on *Christine's* creek. B., who then owned a tract of land lying higher up on the same creek, told A., at the time of erection, that he would sue A., should the dam injure his own land. B. afterwards lived on his tract four years, and never complained of any injury from the dam; but B. and C., to whom the tract was subsequently conveyed by B., said, that they considered the dam a benefit. After the death of A., the mill was sold by his executors at public sale, and was purchased by the defendants. D., then owner of the aforesaid tract, by a prior conveyance from C., was present at the sale, but said nothing respecting the dam's being an injury to his land. D. afterwards conveyed to the plaintiff; who, at a subsequent period, but within twenty years from the erection of the mill, brought suit for injuries occasioned by the dam to his land: *Held*, that the preceding facts were no bar to his recovery.

ERROR to the Court of Common Pleas of *Allegheny* county.

*W. Kerr*, the defendant in error, brought an action on the case against *Alexander* and *M'Kown*, the plaintiffs in error, to recover damages for injury done to his land, by the overflowing of water, alleged to be occasioned by a mill-dam belonging to the plaintiffs in

(Alexander and another *v.* Kerr.)

error. The land thus overflowed, of which a part is bottom land, lies on *Christine's* creek, and was bought by *D. Herbert*, in 1786, who resided thereon till 1813, when he conveyed it to *W. Gilmore*. In *August*, 1820, *E. Kerr* purchased this land from *Gilmore*; and in *January*, 1824, *E. Kerr* conveyed the same to *W. Kerr*. The mill and dam were erected in 1809, or 1810, by *T. Algeo*, upon land owned by him, and lying on the same creek, but at the distance of about one hundred and twenty perches below the land of *W. Kerr*. After the death of *Algeo*, his executors sold the mill, and thirteen acres of land, at public sale, for eight thousand eight hundred and fifty dollars, when it was purchased by *Alexander* and *M'Kown*.

On the trial in the court below, it appeared in evidence, that *Herbert*, then owner of the land now belonging to *W. Kerr*, had told *Algeo*, about the time of the erection of the mill-dam, that, if the dam should swell the water, so as to injure the land, he would bring suit against *Algeo*. *Herbert* lived on the land several years after this period, and never brought suit; neither did it appear that he, or any of the subsequent owners of the land, had ever complained of any injury, as resulting from the erection of the mill-dam; but it was testified, that *Herbert* had said, while owner, that the dam did no injury to his land; for, although it swelled the water higher, when there was a flood in the creek, yet it lessened the rapidity of the current, and his banks were less injured. It appeared, that *Gilmore* also had said, while owner, that he considered the dam a benefit.

At the sale of *Algeo's* land by his executors, *E. Kerr*, then owner of the land now belonging to *W. Kerr*, was present, and gave no notice that the dam did any injury to his land, but was altogether silent respecting it.

It was proved, by many witnesses, that occasional floods, and especially within the last ten years, had repeatedly overflowed the bottom land of the tract owned by *W. Kerr*, forming one or more ponds thereon, carrying off the soil in various places, and covering portions of it with sand and drift wood. Whether, and how far, the mill-dam was the cause of this injury, by occasioning a backwater, which overflowed the land, was the subject of contradictory testimony.

The defendants below produced witnesses to prove, that the land in question had been overflowed during seasons of high water in the creek, before the erection of the mill; that a breast-work had been built by *Herbert* on this land, long before the dam was erected, to prevent the water from running through the bottom land, which had been carried away by floods before the dam was built; that the creek overflows, and injures the bottom lands of other farms, which are at a distance from any mill-dam; that several other tracts had been much more injured than this; that the thirteen acres which they had bought at public sale, would, without the mill, be of very little value; and that they had paid near two-thirds

(Alexander and another *v.* Kerr.)

of the purchase money for the said mill, and thirteen acres, before the commencement of this suit.

The counsel for the defendants below, requested the charge of the court on various points, of which it is necessary to give only the *third* and *fourth*.

" 3. *Herbert*, under whom the plaintiff derives title, said the dam was rather a benefit than an injury, and he never complained. *Gilmore* made the same declarations. After *E. Kerr* had purchased, he lived on the land, and never complained of any injury from the dam. He sold to the plaintiff, who lived in the neighbourhood, and had an opportunity of knowing the situation of the bottom land, before he purchased. *E. Kerr* attended the public sale, and made no objection to the dam, nor gave any warning to bidders not to bid. The defendants are innocent purchasers, for eight thousand eight hundred and fifty dollars; and the property, without the mill, is not worth three hundred dollars. They had paid two thousand dollars in cash, of the purchase-money, before the suit was brought. If these facts are believed by the jury, they amount in law to an acquiescence in the erection of the dam, and an abandonment of all claim for damages by those under whom the plaintiff claims, especially by *E. Kerr*; and the plaintiff himself is not entitled to a verdict.

" 4. If the facts above stated are not conclusive evidence of an acquiescence, in the erection and continuance of the dam, and an abandonment of all claims to damages arising therefrom, they are strong evidence of them; and after so great a lapse of time, during which the land of the plaintiff has passed through three different hands, and the defendants have bought from *Algeo*, who built the mill, this action is not to be favoured."

The President charged the jury as follows:

" If the credit of the witnesses, who have been examined, and between whom there is so much discrepancy, should be unimpeachable, you ought to give your credence to those whose judgment has appeared the least erroneous, and whose opinions appear to be founded on the soundest principles of philosophy, and the natural consequences that must be the result of the circumstances that have been testified to. You will then inquire, what would be the probable consequences, created by the erection of a dam immediately below the plaintiff's possessions on the creek. Would the effect be, to prevent the passage of ice in the spring, and throw that and drift-wood on the meadow and corn-field of the plaintiff? Would it be, to throw the surplus waters created by ordinary floods on the lands of the plaintiff, and do injury to the crops? Would it be, to convert the most profitable portion of his bottom lands into a sand-bank, or a gravel-bank? Or, would the effect of it be, as is contended by the defendants, to cause a deposite that would enrich the soil, and give additional value to the plaintiff's property? You will recal the testimony, and make such inferences from the facts in evi-

(Alexander and another *v.* Kerr.)

dence, as will sustain those opinions of the witnesses, which to you may seem most consistent with the effects usually produced by the erection of a mill-dam.

"The defendants would be liable for damages, in cases of extraordinary, as well as ordinary floods, if the jury are satisfied that such damages were the effect of the dam.

"It is a maxim in law, that a man must so use his own property, as not to injure the property of his neighbour. If a citizen is bound to submit to a small inconvenience, he is by the same rule bound to submit to a great one. If I have a right to flood my neighbour's field, by raising the water on it one inch, I have the same right to raise it twelve inches over his meadow. What, then, shall hinder me from raising it to such an elevation as shall prove utter ruin? I have, therefore, no hesitation in saying, that, if the erection of *Algeo's* dam has caused injury to the plaintiff's field, upon common law principles, the plaintiff would be entitled to recover."

Answer to the defendants' *third* point.—"Whether the defendant is an innocent purchaser, without notice, is one of the facts in controversy. It cannot be assumed; nor can any man be considered in that light, in relation to a party, who, at the time was in possession of his own property, with an undisputed boundary, and under an unquestionable title.

"Supposing the facts, with the exception of that already observed upon, to have existed as stated in the third point made by the defendants' counsel; if the defendants did not purchase under the ownership of *Herbert* or *Gilmore ;* if there is no reason to presume, that *Herbert's* declarations, or *Gilmore's* opinions, as to the beneficial effect of the dam, were made known to the defendants at the time of, or before their purchase, or that they operated upon them so far as to be inducements towards becoming purchasers; the circumstance, that *E. Kerr* resided on the land, and made no objection to the raising of the dam; that the plaintiff lived near the land before the purchase; and that *E. Kerr* attended the sale without notifying purchasers of the existence of the nuisance, combined even with the length of time that elapsed, do not furnish conclusive evidence of an abandonment of right, or an acquiescence in the nuisance by the present plaintiff; nor can they be construed by equity into that description of fraud that will bar the plaintiff's recovery.

"It is true, it is said, by certain elementary writers, to be a fraud in any man, to stand by whilst property is selling, to which he may have title, and not give notice thereof to purchasers. This standing by, is deemed in equity, to be an encouragement to innocent men to lay out their money for mere moonshine; and he who has a title, and permits purchasers so to lay out their money, without warning, shall be considered as acting fraudulently, and shall be considered as a trustee for the person so deceived. For this principle no case can be found, but taking it to be the law, it is not applicable to this

(Alexander and another *v.* Kerr.)

case. *Ebenezer Kerr*, although present at the sale, concealed nothing. The elevation of the dam, the effect of floods, the injuries supposed to be done, were facts which were within the power of any purchasers to know, and the jury are bound to infer, that every prudent purchaser made the necessary inquiries. There could be no concealment where facts were notorious to the neighbourhood; there could be no pocketing of titles, no secreting of rights, when the annual floods of the neighbouring country stood ready to announce all that purchasers should have inquired about. Besides, *Kerr* was in possession of the land, and had the title in him—its extent was notorious. The purchasers of the mill were bound to inquire in relation to the boundaries. If they did so, they either discovered, that the water overflowed the land, or that it did not. In the former case, they consented to run the risk; in the latter, they had no risk to run. If they made no inquiry, upon themselves must rest the loss."

Answer to the *fourth* point.—"I do not think the facts, as stated, ought to be regarded as strong evidence of acquiescence in the erection and continuance of the dam, and as an abandonment of all claims to damages arising therefrom. On the contrary, I think they furnish but a bare evidence of the abandonment and acquiescence contended for; although you may, if you think proper, presume it from them. And I must confess, I can see no reason why, if you believe the dam is a nuisance, and that the plaintiff has sustained an injury, his suit should not be as highly favoured as that of any other claimant in a court of justice."

The jury found a verdict for the plaintiff below.

The following errors were assigned:—

"1. The Court erred in stating to the jury, that the defendants below were answerable for damages occasioned by extraordinary floods, if they were the effect of the dam.

"2. In their answers to the defendants' *third* and *fourth* points.

"3. In stating in substance, that injuries, however slight, occasioned by the erection and use of a mill-dam, were the subject of an action for damages."

*Burke* and *Forward*, for the plaintiffs in error.

1. A slight inconvenience, arising from the reasonable use of a man's own property, furnishes no ground of action. *Com. Dig. Action on the Case, C.* 3 *Caines*, 307. 15 *Johns. Rep.* 213. 8 *Mass. Rep.* 136.

2. As to the *third* and *fourth* points of the defendants below. The fact of acquiescence for fifteen years, is sufficient to bar this action. *Rob. Fraud. Conv.* 529, 530. Standing by, and remaining silent at the public sale, is sufficient to postpone any right of *W. Kerr* to compensation, to the interest of a purchaser without notice. 1 *Serg. & Rawle*, 111. Lying by, while improvements are made, has had that effect. 2 *P. Wms.* 82, 83. 2 *Eq. Ca. Ab.* 488. 9 *Mod.* 2, 3. 1 *Hen. & Munf.* 429. 2 *Caines*, 382. 2 *Johns. Rep.* 573. 5

(Alexander and another *v.* Kerr.)

*Ves.* 689, *MS. Note. Rob. on Stat. Frauds,* 129, 132. 3 *Atk.* 692.
2 *Atk.* 82. 3 *Serg. & Rawle,* 203. 10 *Serg. & Rawle,* 43. 13 *Serg.
& Rawle,* 304: 1 *Fonb.* 163. 8 *Serg. & Rawle,* 92. 2 *Munf.* 468.
5 *Munf.* 334.

*Fetterman* and *Baldwin,* for the defendant in error, were di-
rected to confine themselves to the *second* point made in this court.

A license, merely gratuitous, may be revoked at any time. 10
*Johns. Rep.* 246. 3 *Dane's Ab.* 252. 11 *Mass.* 503. Lying by is
no stronger than such a license, and a change in the ownership of
the land, is equivalent to a revocation of such license. 11 *Mass.
Rep.* 503. 6 *Johns. Rep.* 136. The defendants below had, in fact,
notice from the very nature of the nuisance. *Sugd. Vend. and
Purch.* 478. 9 *Mod.* 96. 1 *Vern.* 136: 2 *Vern.* 150, 239, 370.

The opinion of the court was delivered by

Gibson, C. J.—It is supposed, that an inconsiderable injury from
a nuisance, is an insufficient cause of action. Admitting the pro-
priety of the judgment in the particular cases that have been cited
in support of the position, I am unable to concur in the reasons of
the judges, who seem to have thought, that the right to recover at
all, depends rather on the extent than the nature of the injury. The
true distinction seems to be, between cases where the injury is *re-
mote* and *common to many,* without particular damage to any one,
and those where it is proximate in its effect, and confined to parti-
cular persons. For injuries of the first class, it is proved by the au-
thorities collected in *Com. Dig. Action B,* 2, that an action does
not lie. And of this class are the cases cited from the *New York*
and *Massachusetts Reports,* as well as the case of *Shrunk* v. *The
Schuylkill Navigation Company,* 14 *Serg. & Rawle,* 74, which
was an action for obstructing the passage of fish, by which the plain-
tiff's fishery was destroyed. And there is sound reason for the dis-
tinction. All persons have a natural right to the use of water
flowing over their land. But if each were answerable to all the rest
for consequences that are in a greater or less degree inseparable
from every exercise of the right, the benefit of the stream would be
lost to all; for no one could use it without producing a diminution
of its quantity by consumption, or evaporation, or an irregularity in
the flow of it by retention. The law, therefore, requires each to
bear with the consequences of a reasonable use of it by his neigh-
bour. But these consequences, instead of being slightly injurious,
may be destructive of valuable natural advantages. The consump-
tion of but a small portion of the stream, might, by rendering the
residue insufficient for the purposes of a mill, destroy a valuable
site; and, the retention of the water for but short intervals, would
render the stream useless to a furnace, the operations of which, can-
not be intermitted. But this would not give a claim to the value of
the site in damages. So, an action will not lie for the destruction
of a fishery from an erection which prevents the passage of the fish.

(Alexander and another *v.* Kerr.)

In these cases the injury is remote, the party having no property in the water used, or retained, nor in the fish before they are caught; and it is general in its consequences to all occupants of the stream, similarly situated.   But to flood the land of an adjoining occupant, is not necessary to the enjoyment of any natural right.   The injury produced by it, is out of the common course, and done to an individual; and whether it be great, or whether it be small, is a consideration that can affect only the *quantum* of the damages.

In the application of the principles connected with the remaining point, there may, perhaps, be greater difficulty.

Before the dam was erected, the terretenant of the land now owned by the plaintiff, objected to its being erected, as being likely to prove injurious to him.   From that time to the inception of this action, neither he nor his successors, testified any dissatisfaction, usually grinding their corn at the mill, and some of them declaring, that the dam did the place no injury; and one of them being present when the mill was purchased by the defendants, omitted to give notice of the existence of the injury for which damages are sought, and to declare his determination to insist on having it removed.

The equity attempted to be deduced from these circumstances, depends on distinct considerations.   Against the original author of a nuisance, no forbearance to sue, short of the period which, in analogy to the statute of limitations, has been assumed as conclusive in the case of an adverse occupancy of a water right, can be set up as a bar; and as the dam was erected in 1810, it is impossible that there can have been a forbearance for twenty years.   Nor can this period be abridged by the interference of a purchaser, who has no reason to infer, from a forbearance for a considerable time, a determination to forbear for ever.   Such a purchaser, voluntarily, and with full knowledge, takes the place of a wrongdoer, and stands in no higher equity.   He, therefore, has no right to be informed, that the suffering party has not abandoned his rights.   But a positive act, calculated to induce him to purchase, would place him on higher ground; and were it shown, that he purchased here on the faith of declarations by the plaintiff's predecessors, that the dam was not injurious to them, I should hold the merits of the cause to be with him.   But that circumstance was not an ingredient in the case submitted to the court, nor is any thing of the sort to be found in the evidence.   The defence, then, rests exclusively on the effect of *Ebenezer Kerr's* silence at the sale; for if the circumstances which I have just mentioned, be insufficient to raise an equity, considered separately, they will be insufficient in conjunction with other circumstances, which separately are also insufficient.

Undoubtedly, there are cases where the mere concealment of the title of a third person, may be fatal to his right; and this principle may, according to circumstances, be applicable to the case of a nuisance, caused by an erection on the property purchased.   Where the existence of the nuisance is not self-evident, it may unquestion-

(Alexander and another *v*. Kerr.)

ably be the duty of the party injured, to apprize the purchaser of the responsibility to which he is about to subject himself. But while courts of justice have, on the one hand, endeavoured to repress dishonesty, they have, on the other, exacted the utmost vigilance and caution. It is difficult to imagine, how the concealment of a fact, which an individual of common prudence and sagacity would discover, can constitute a fraud. It is a clear elementary principle, that the law imputes to the purchaser a knowledge of every fact, of which the exercise of ordinary diligence would have put him in possession. *Newl. Cont.* 511. And, such an imputation of knowledge is sufficient to rebut the inference of a merely constructive fraud, which might otherwise be implied from the silence of a party. Even a positive misrepresentation which, when it induces a careful man to forego an inquiry that would have resulted in full knowledge, constitutes positive fraud, even where the means of information is not exclusively within his reach, will, nevertheless, not give him an equity, if he had, in fact, a knowledge of the true state of the case, derived from other sources, *because he was in truth not deceived.* It is also a familiar rule, that notice is unnecessary, where the fact is equally within the knowledge of both parties; which it must be taken to be, where the sources of information are equally accessible to both, and the state of the fact is obvious to the senses. These are elementary principles, about which, I presume, there is no dispute; and what evidence is there in the case, that would induce a chancellor to enjoin the plaintiff from proceeding at law?

It does not appear, that the plaintiff's grounds were inundated while the stream was at low water mark; and hence, it might seem, that the injury was only occasional, and that the traces of it were not permanently obvious. But the water was swelled in the channel within the plaintiff's boundary, even when the dam was not full, and the grounds exhibited permanent marks of injury from high water; ponds being formed, the soil washed away in some places down to the gravel, and the fields sanded, and covered with drift wood. It is in reference to the existence of an injury such as this, that the silence of *Ebenezer Kerr* is supposed to constitute a fraud.

The defendants were, unquestionably, bound to inspect the subject of their purchase; without which, they would become chargeable with gross negligence, which is equivalent to actual knowledge of whatever a personal examination would have disclosed, or put within the range of detection. The slack water extending from the dam to a point within the plaintiff's boundary, and the marks of injury to the grounds, were amply sufficient to put them on their guard; and, as the direction of the court is to be considered in reference to the case appearing on the evidence, it seems to me, there was no error in charging, that the silence of *Ebenezer Kerr* at the sale, ought not to prejudice the plaintiff's claim to damages in this action.

(Alexander and another *v.* Kerr.)·

Huston, J.—In this, as in most cases, it is necessary to attend minutely to facts and dates, in order to understand the opinion of the court.

*Daniel Herbert,* in 1786, purchased a tract of land, and resided on it until 1813, when he sold it to *William Gilmore.* On the 26th of *August,* 1820, *Gilmore* conveyed it to *Ebenezer Kerr.* It was stated and conceded, that though the deed was made in 1820, yet, articles had been entered into, and possession delivered to *Kerr* several years previous. In 1824, *Ebenezer Kerr* sold to *William Kerr,* the plaintiff below. The land lay on *Charteirs* creek.

*T. Algeo* owned some land on the same creek, below the above-mentioned tract, and erected a mill, about 1809, on it. *Herbert,* who then owned the plaintiff's land, told *Algeo,* that if the dam he was erecting should swell the water so as to injure his (*Herbert's,*) place, he would bring suit against him. *Herbert,* however, lived there four years, and never did bring suit, nor complain of injury. On the contrary, it was proved, that he said the dam did no injury; for that although it swelled the water higher when a flood was in the creek, yet it lessened the rapidity of the current, and his banks were less injured. Several years after the mill was built, an additional water wheel put in and another pair of stones. *Algeo* died, and his executors sold the mill and thirteen acres of land, at public vendue, for eight thousand eight hundred and fifty dollars. *Ebenezer Kerr,* who then owned the plaintiff's land, was at the sale, and gave no notice. All the witnesses agreed, that without the mill, the thirteen acres were not worth three hundred dollars. The proof was, that the defendants had paid all but about three thousand dollars of the purchase money, before this suit was brought. The plaintiff's counsel alleged, they had not paid so much. The deed from the executors to the defendants was not produced, but it was said to contain no warranty as to water right. The defendants have refused to pay any more money until this is settled. Much testimony was given to prove, that the plaintiff's land was overflowed at high water, before the mill was erected: That a breast work had been built thirty years ago, to keep the water from running through the bottom land, and the flood carried it away immediately: That this creek overflows and injures the bottom land on other farms where no dam was near them; and that several have been injured much more than this.

There was no proof that this tract is injured, except in time of floods; but there was proof, that it had been overflowed in part, and injured repeatedly within ten years; and that floods had, in one or more places, carried off the soil loosened by the plough.

It is not to be forgotten, that the dam was not opposite the plaintiff's land, but was one hundred and eighteen perches below the plaintiff's lower line. So that in examining the breast and ends of the dam, the plaintiff's land would not be in view. No part of the premises bought, touch, or come near the plaintiff. It is a conse-

(Alexander and another *v.* Kerr.)

quential injury, not constant and visible at all times; but occurring only when high floods occur; and that injury not discoverable from an examination of the premises bought by the defendants.

There was much contradictory testimony, whether any injury at all had been done to the plaintiff's land. And the court told the jury, that if they could not decide from the testimony, whether there was, or was not, any damage to the plaintiff, they ought to give credence to those opinions which appear to be founded on the soundest principles of philosophy, and the natural consequences that must be the result of the circumstances that have been testified to. I will only say, this is to me new ground, and I think most dangerous. Whether a flood will carry away soil, or leave a deposite, cannot, I believe, be ascertained beforehand, by those who have viewed the ground, even while covered with water; and the testimony of one witness, who saw it after the flood, and who testified, that no soil was washed away, but that the flood left a deposite on the ground, would outweigh all the reasonings of all the philosophers in the world. I do not say there is no case in which a witness may be disbelieved, because his testimony is contrary to the nature of things; but I protest against introducing speculations of *philosophy*, to overrule positive testimony of plain, honest, men. The principal questions in this case, arose on the effect to be produced by the declarations of *Herbert* and *Gilmore*, under whom the plaintiff claimed, and the silence of *E. Kerr*, who was at the vendue, and gave no notice; who saw the defendants buy for eight thousand dollars; and who, as the plaintiff contends, had the right to reduce the property to be worth only three hundred, and who did not mention this right of his. The judge says, "he had his deed recorded, and they must look to that, and he was not bound to give notice." But it is obvious his deed could not give any information on the subject of the water rising, or that when it rose, it overflowed its banks. The judge says, "there is no evidence that the defendants ever heard, that *Herbert* and *Gilmore* said, it did not injure this land; but," he says, "they were bound to inquire." Now, if they did inquire, they heard what would have induced them to purchase. But after a dam had stood many years, after the plaintiff's lands had changed owners three times, and no complaint, the then owner being present, was bound, by every principle of justice, to make known this concealed claim of right of his to pull down that dam, and render the property of no value.

It ought not to be forgotten, that in newly settled parts of the country, he who builds a mill, is considered as doing a great benefit to the neighbourhood. If it is true, that he may be not only permitted, but encouraged to build; that all the owners of adjoining lands may expressly or tacitly agree, and yet, when the mill has become valuable, the vendee of any of those who agreed to its being built, nay, the fourth vendee, when none of prior owners had objected, may compel him who built it, or his children, after his death,

(Alexander and another *v*. Kerr.)

or the purchaser of what the builder and his children had enjoyed in peace, to pull down the dam, it is time this should be known. It is said, this matter has not been decided; that it is only to be found in elementary writers. This is a great oversight. I should suppose one hundred cases could be collected in a short time. I shall mention a few from the *English* books, and will only add, that the modern cases are not contrary.

2 *Atk.* 83. Where a man has suffered another to go on building upon his ground, and not set up a right till afterwards, when he was all the time conusant of his right, and the person building had no notice of the other's right, chancery will oblige the owner of the ground to permit the other to enjoy quietly and without disturbance.

3 *Atk.* 692. Tenant for life makes a lease for sixty years; tenant rebuilds the houses at a great expense, and assigns his lease. In the twenty-ninth year tenant for life died; the tenant in possession paid the rent for six years to the remainderman; and in the mean time made additional buildings. Remainderman brought ejectment and recovered; and an injunction granted, because the remainderman stood by and saw tenant rebuild and gave no notice; and because he accepted rent while tenant was adding additional buildings and gave no notice. Here a title good at law, and a recovery at law, were postponed; and yet it might, with some colour, have been said, the tenant was bound to inquire into the title of his landlord; this, however, was not sufficient to protect the legal owner, who was estopped by his own silence.

*Rice* v. *Potts, Precedents in Chancery,* 35. A. was tenant in tail, remainder to B. in tail. A., not knowing of the remainder, made a settlement on his wife by way of jointure; this was engrossed by B., who knew of the entail, but was silent. After the death of A., B. brought ejectment, and recovered against the widow. She was relieved in chancery, and a perpetual injunction granted. 2 *Vern.* 150. .

2 *Johns. Rep.* 589. THOMPSON, Justice, in delivering the unanimous opinion of the court, says, " Though it does not appear that B. took any agency in the negotiation, yet his presence and silence are equally efficacious and binding on him, if the complainant was thereby misled and deceived. There is an implied as well as an express assent; as, when a man who has a title, and knows it, stands by and either encourages or does not forbid the purchase, he and all claiming under him shall be bound." And he quotes, with approbation, the sentence in equity; " therefore, when a man has been silent when in conscience he ought to have spoken, he shall be debarred from speaking when conscience requires him to be silent." In this case, too, a legal title was postponed.

The decisions of our own courts are also strong on this subject.

*Covert* v. *Irwin*, 3 *Serg. & Rawle*, 289. Land was selling by the sheriff as the property of *T. Proctor*. *Covert* was in posses-

(Alexander and another *v.* Kerr.)

sion of the land, claiming it as his own; but it had been somehow reported that he was in under *Proctor;* he was present at the sale. The opinion of this court, delivered by the late Chief Justice, was, "I think the court were right in the opinion, that if *Covert* did stand by, knowing that he was represented as *Proctor's* tenant, and not contradicting it, he could not afterwards contest the title of *Proctor* with the purchaser." In this case *E. Kerr* stood by and saw this mill selling, with the dam as it is now; if he did not make known his claim of a right to compel it to be taken down, I do not see how he can, or why he ought to be permitted to assert that right now.

*Billington* v. *Welsh,* 5 *Binn.* 129. *Welsh* had purchased and paid for fifty acres of land, part of a tract of *Turner's,* on which was a forge, &c. &c., had built a house on it, and was living there; he was a brother-in-law of *Turner's.* The whole tract was levied on as *Turner's,* advertised several times, and at length sold. *Welsh* knew well of the advertisement. The cause was tried before Judge YEATES, who told the jury that if *Welsh* knew of what was going on, he ought to have given notice of his claim to the sheriff, and warned all persons against purchasing; failing herein, a legal fraud would be imputed to him. On appeal this was affirmed. Chief Justice TILGHMAN says, "it became his duty to make known his secret title to part of the land; he gave no notice: not having done so, he acted at his peril, and has no right to complain if his title is impeached by persons who had not actual notice of it." When we consider the law of levies and sheriff's sales, that a plaintiff can take only what is the defendant's, and that a purchaser buys at his peril, that case is much stronger than this.

13 *Serg. & Rawle,* 167, is a late case, and the principle is fully recognised. The sheriff was selling a tract of land on the oldest judgment, but notice was given at the sale that it would be sold subject to a younger mortgage. The purchaser refused to pay the mortgage. This court held, that although it could not legally be sold subject to the mortgage, yet as the purchaser, who was the plaintiff at whose execution it was sold, was silent, and did not make known his opinion, that the purchaser would hold it clear of the mortgage, he could not keep the land without paying the mortgage; his silence was considered equal to his express agreement, that it should be sold subject to the mortgage; and that silence cost him his debt.

The case in 8 *Serg. & Rawle,* 92, is nearly in point. A dispute arose as to the right to use an alley in *Philadelphia.* The court were of opinion against the right of the plaintiff; it had been conveyed by one whose right would not authorize such a conveyance; but the alley was used by all those living in the court. The plaintiff bought, and though by a close examination of the deeds it could be discovered that her title to the use of the alley was not good, yet she recovered against the defendant for disturbing her in the

(Alexander and another *v.* Kerr.)

use of it, on the ground that when she bought she saw those who lived in the court actually using the alley. "Shall," says the Chief Justice, "the defendant be permitted to hold out false colours to the injury of innocent purchasers? Is not the case as strong against him as against a prior mortgagee who is privy to a second mortgage and conceals his own."

Let us now look at the matter on principle. Admit that *Herbert* might have sued and recovered damages; he would not, he did not; but he sold to *Gilmore*. What did he sell? his land as it then was, with the dam erected. *Gilmore* not only did not claim a right to pull down the dam, but he did not wish for such a right; he said it did him no harm. Clearly, he did not sell to *E. Kerr*, nor did *E. Kerr* possess the right to compel *Algeo* or *Algeo's* heirs to pull down this dam. He lived there some eight or ten years; stood by and saw it sold, for twenty times its value, if the dam were removed; he gave no notice, because he had no right, or because he was determined never to use it; and the present plaintiff is as much bound as he was.

It has, however, been argued, that if notice is given before all the purchase money is paid, a purchaser is not protected. As to the fact, the proof is not contradicted by any proof, though it was by the statement of counsel, that above four thousand dollars had been paid, and something more than three thousand dollars remained due; and *Sugden* was cited to prove the position, that if notice is given before the deed is executed, though all the money is paid, or before all the money is paid, though after the deed is executed, the purchaser is not to be considered as an innocent purchaser without notice. Admitting, for the present, what I do not agree to without qualification, that the law is so settled, it will be found to apply to cases where the notice was given as soon as the purchase was heard of, and has no relation to cases where a man stood by and saw a contract made, possession taken, a great part of the money paid, and a deed received, without those clauses which would have been required if notice had been given. It can only apply to cases where he who gives the notice did not know of a bargain proceeding. The law is not so absurd as to permit a man to see a sale made, and nine-tenths of the money paid, possession taken and kept for years, the money paid to executors, and by them to creditors or heirs, and irreclaimable; and, after all this, consider his conduct fair, if he gives notice before the last ten dollars are paid.

But even *Gilmore*, if now in possession, and owner, could not, on the testimony given, support a suit against *Algeo*, if alive, although *Herbert* did tell *Algeo* that he would sue him if the dam injured his place; yet he afterwards said it did him no injury, and he did not sue. *Gilmore* purchased, and said it did him no injury; and, after this, *Algeo* put another water wheel and additional stones in the mill, and increased its value at great expense. It would have been a fraud in him to have required afterwards that all

(Alexander and another *v.* Kerr.)

this should be destroyed; and if he had recovered at law, chancery would have granted an injunction. Many of the cases cited prove this; and there is another in 2 *Eq. Ca. Ab.* 522., and cited and approved in *Harrison's Chancery,* 172. A. sees pipes laid at great expense, and makes no objection; afterwards he sues, and chancery granted an injunction. In fact, the principle is the same whether a man is permitted to improve at a great expense, or purchase at a high price; in neither of which cases can a man, who has permitted the alleged nuisance to stand many years without objection, and who sees additional money expending, without objection, be heard, when he afterwards applies to a court to render the improvements or the purchase worthless.

I see much evil and injustice in this individual case, and more in its consequences. If the owner of land can suffer a friend to erect a dam, and make no complaint for fifteen years, till that friend sells it, and then cause it to be pulled down, it is a serious matter to the community: but if the owner of land permits a dam to be built, which occasions the water to swell on his land, and sells his land, as the land then is, with the water swelled; if it is sold again, and no objection is made; if, under these circumstances, the mill has been enlarged and improved at great expense, and is sold for its full value, and, after this, the terretenant sells to a fourth owner, and he can overhaul all this and destroy the mill, it is, to my mind, a great imputation on our laws; such has not been the understanding, nor such the decisions. I think there was error in the charge of the court.

Tod, J., concurred with Huston, J.

Judgment affirmed.