**Pennsylvania Environmental Management Services, Inc. v. Commonwealth**

*Thomas Riley, Jr.,* for appellant.
*Randall J. Brubaker,* for Commonwealth.
*Bruce Katcher* and *George Brutscher,* for intervenors.

WATERS, *Chairman,* February 13, 1981—This matter comes before the board as an appeal from the denial of a solid waste permit for operation of a landfill in New Garden Township, Chester County, Pa. The proposed landfill is to be located about one quarter mile from a small privately owned airport and the intervenors, Alex and Anne duPont, allege that the landfill will attract birds and create a bird hazard for aircraft. DER's denial of the permit was based on this fact alone, primarily on a recommendation from PennDOT. Appellant, PEMS, has developed a bird control program which it believes will allow the airport to continue its safe operation.

## FINDINGS OF FACT

1. Appellant is Pennsylvania Environmental Management Services, Inc. (PEMS). PEMS is appealing the denial of its application for a permit for a sanitary landfill in New Garden Township, Chester County.

2. Appellee is the Commonwealth of Pennsylvania, Department of Environmental Resources (DER).

3. Intervenors are New Garden Aviation, Inc., Alexis I. duPont and Anne duPont (Intervenors). New Garden Aviation, Inc. operates the New Garden Flying Field (hereinafter the Airport or 'New Garden Flying Field), a public use general aviation airport located in New Garden Township. The airport has been in operation since 1967. Mr. and Mrs. duPont are the sole stockholders of New Garden Aviation, Inc. and lease to the corporation the real estate on which the airport is located, having purchased it in parcels between 1965 and 1972. The other intervenors are New Garden Township, Ralph LaFrance and County of Chester.

4. The landfill application at issue herein is one of two applications filed by PEMS for landfill permits in New Garden Township (hereinafter Site no. 1 and Site no. 2).

5. Site no. 1 was to have been located approximately 2,000 feet off the edge of the airport's main runway to the northeast and Site no. 2 was to have been located within 4,200 feet of the main runway and 3,200 feet of the secondary or crosswing runway to the northwest.

6. The application for Site no. 1 was denied by DER by letter dated October 27, 1978 on the basis of twelve design and environmental deficiencies. PEMS appealed this denial, Pa. Environmental Management Services, Inc. v. Dept. of Environmental Resources, EHB Docket no. 78-146-D, which appeal was voluntarily discontinued by PEMS in December, 1979.

7. The present appeal involves the denial of PEMS' application for Site no. 2. The Site no. 2 application was denied by DER by letter dated September 7, 1979 which stated, inter alia, as follows:

"The operation of New Garden Facility No. 2 will

serve to attract birds to the landfill site and surrounding area. The attraction of birds by a land disposal site located in close proximity to the New Garden Flying Field, increases the probability of a birdstrike to aircraft and constitutes or risks creating a public nuisance in violation of the Pennsylvania Solid Waste Management Act, Act 241, the Act of July 31, 1968, P.L. 788, as amended, 35 P.S. §6001 et seq. and the rules and regulations adopted thereunder.

"Therefore, the application for Solid Waste Permit No. 10111 is hereby denied." A similar reason was given by DER as one basis for the denial of Site no. 1.

8. Site no. 2 and the airport are located approximately 16 miles northwest of the Delaware River at its closest point, and 20 miles north/northeast of the Chesapeake Bay at its closest point.

9. U.S. Route 1, a major multilane highway, runs almost adjacent to the northernmost boundary of Site no. 2 and the White Clay Creek crosses the western side of the site.

10. The area immediately surrounding the airport and Site no. 2 consists of mixed development. The nearby municipalities of Toughkenamon and Avondale are densely developed. Most of the remainder of the immediate area is mixed agricultural use and open fields. Several individual residences are located along Glen Willow Road adjacent to Site no. 2's western edge and others are scattered around the area of the site.

11. The airport is an active general aviation facility averaging 40,000 annual operations (takeoffs and landings). Any member of the public may use the airport. There is a nominal $3 landing fee collected on an irregular basis.

474

12. The airport is used by turboprop, pure jet, and piston engine (propeller-driven) aircraft for business, training, and recreational flights. A turboprop aircraft is powered by a turbine engine with a propeller on the front. It is a kind of jet aircraft and flies at a faster speed than a piston engine aircraft.

13. Aircraft may land and take off at the airport 24 hours a day since the main runway is lighted.

14. The importance of the airport to the regional transportation system is officially recognized at the Federal and state levels. The airport is designated as a reliever airport for Philadelphia International Airport by the FAA in the National Airport System Plan (National Plan) developed pursuant to the Airport and Airway Development Act (the ADA Act) May 21, 1970, 84 Stat. 219, as amended, 49 U.S.C.A. § 1701 et seq. The airport was so designated on or about April 25, 1978. It is also included in PennDOT's State Aviation System Plan (State Plan) as part of the Commonwealth's recommended general aviation system.

15. Various kinds of aircraft damage can result from birdstrikes. Such damage may affect aircraft performance requiring a hard landing or resulting in a crash, or it may involve a situation where structural repair work is necessary.

16. Although damaging birdstrikes may occur on any part of an aircraft, the most critical situations involve damage to the aircraft engine resulting in a loss of power or the penetration of a bird through an aircraft window injuring the pilot so that he is unable to continue the flight. Both of these situations have resulted in accidents and loss of life.

17. Among types of aircraft, the smaller class of civilian aircraft is the most susceptible to birdstrike damage and personal injury. This is the class of

aircraft, also referred to as general aviation aircraft, that utilizes the airport. These aircraft are not as structurally strong as the larger air carrier and military aircraft and are not designed with the redundancy of systems (e.g., multiple engines, hydraulic and electrical systems) that these latter two classes have to enable them to continue to operate effectively in the presence of substantial damage.

18. The different stages of aircraft flight are take-off, climb-out, cruising, approach and landing. The highest risk phases of flight from the standpoint of birdstrikes are take-off, climb-out, approach and landing. Most aircraft activity in these phases of flight takes place below the altitude of 1,000 feet which is also the altitude below which most bird activity occurs.

19. "Traffic pattern" refers to aircraft flight maneuvers approaching and departing from airports. The typical VFR traffic pattern altitude is flown at 800 to 1,000 feet above ground level. The VFR traffic pattern at the airport is closer to the 1,000 foot altitude.

20. The basic daily needs and activities of birds are (1) eating, (2) drinking and bathing, (3) loafing and socializing, (4) roosting and (5) seeking shelter. Nesting and migration are other important bird activities which are engaged in on a seasonal basis. Not all birds are migratory, however, and may remain in the same area throughout the year.

21. Feeding is the most essential of birds' daily needs because of the importance of food to survival, and a source of food is one of the strongest bird attractants. Birds are extremely persistent and tenacious in searching out and obtaining food and feeding is a highly competitive and antagonistic activity.

22. It is common for gulls to travel up to 50 miles

from their roost to a source of food. Starlings, blackbirds, and cattle egrets may travel up to 15 miles and crows up to 30 miles.

23 .Gulls leave their overnight roosts about dawn to go feeding. They may travel singly, in pairs, or in flocks. After travelling to a food source and feeding for an hour or two they will travel to a nearby area to loaf and then return later in the day to feed again before departing for their roosting area about an hour before sunset.

24. Starlings and blackbirds also leave the roost in the morning to feed. They move out in all directions, flying flocks and aggregations rather than by individual flight, and range widely looking for food and roost sites.

25. Most daily bird flight activity takes place below 500 feet and can be expected to occur between 100 and 700 feet, although birds may fly to higher altitudes in order to obtain an unobstructed view of their feeding destination.

26. In addition to gulls, several other species of birds regularly feed upon putrescible waste material at sanitary landfills. These include: (1) starlings, (2) blackbirds, (3) cattle egrets, and (4) crows.

27. Certain standard sanitary landfill practices may reduce a landfill's attractiveness to birds relative to open dumps. These practices include the dumping and compaction of waste material on a limited working face by large tractors and compaction equipment and the placement of a soil cover layer over any exposed waste material at the end of each day's operations. This type of operation is consistent with DER's regulations.

28. The number of birds presently found in the vicinity of the airport and Site no. 2 is not significant in terms of bird hazards to aircraft.

29. The major kinds of birds that could be expected to feed at Site no. 2 would include herring gulls, ringbilled gulls, laughing gulls, great black backed gulls, blackbirds, starlings, grackles, cowbirds, cattle egrets and crows. Members of all of the foregoing species, except laughing gulls, were sighted either at the proposed landfill site or within the usual feeding flight distances for these birds.

30. A bird management program was prepared in response to the owner's request for a detailed bird control program.

31. The bird management program proposed to accomplish the following: (1) identify problem bird species and monitor the populations of these species throughout the program, (2) devise a pilot bird control program for the species of concern through a process of testing, through trial and error, a wide variety of bird management techniques, (3) evaluate the results of the pilot program, (4) devise a revised program, and (5) recommend additional research.

32. The management program will have to maintain a continuous level of bird control as the effects are short term.

33. The proposed site for the landfill is located northwest of the flying field, and the site or portions thereof are within 4,200 feet of the main runway and 3,200 feet from the threshold of the secondary, or crosswind, runway, which is seldom used.

34. It is estimated that, in terms of total operations, five percent of the aircraft using the flying field are turboprop, less than one percent are pure jet and the remainder are piston engine.

35. Neither the number of birds which the landfill might attract nor the places from which they would be flying can be determined.

36. The only duly adopted criteria for the siting of solid waste disposal facilities in Pennsylvania in the vicinity of airports are those of the EPA contained in 40 C.F.R. § 257.3-8(c), which provides: "A facility or practice disposing of putrescible wastes that [might] attract birds and which occurs within 10,000 feet (3,048 meters) of any airport runway used by turbojet aircraft or within 5,000 feet (1,524 meters) of any airport runway used by only piston-type aircraft shall not pose a bird hazard to aircraft."

37. The Strasburg Landfill, which is situated in Chester County, is well within the flying distance of birds from the Chesapeake and Delaware Bays. Since the landfill, which accepts putrescible wastes, began operations in April 1979, its manager has observed gulls only in the six-week period from mid-February 1980 to late March 1980. No number of birds have been observed there either prior to or since that time.

38. According to the testimony of the intervenors, seagulls have been seen flying over the flying field only once or twice since 1965.

39. Through the scheduling of man hours, a pair of men have been able to implement the bird management program at the Milliken Landfill site in California located near an airfield seven days a week from sunrise to sunset while averaging 40 hours per week.

40. The program must be operated only seasonally from September through April or May. It is discontinued for the year only after no birds appear at any of the other landfill sites in San Bernadino County.

41. From the commencement of the program the Milliken Sanitary Landfill has experienced an al-

most total elimination of its bird population. Though the program concentrated on seagulls in the beginning because they were in the greatest number, the landfill ended up controlling all birds with the same program. As a result of the bird management program, the bird population at the site has almost ceased to exist.

42. In the opinion of Dr. George, PEMS' expert witness, a program similar to that used at the Milliken Landfill to control birds on the East Coast, can be successful.

43. PEMS proposes that a trained ornithologist with experience in management of problem birds and alleviation of bird problems at airports serve as project director and that a resident ornithologist serve as project ornithologist on the site. Two full-time litter-pickers, who will be trained as bird technicians, will be on site during daylight hours to keep the area clean, maintain constant vigil and institute control measures immediately if problem birds appear. During the early phases of the program the bird technicians will be on site seven days a week.

44. The simultaneous use of several different control methods should prevent birds from becoming acclimated to any one of them and can achieve permanent control.

45. The intensity of the level of management upon a limited working area and the combination of control techniques, designed to avoid an attenuation effect, should insure the success of PEMS' proposed bird management program.

46. The Pennsylvania Department of Transportation (PennDOT) had originally advised DER that it had no objection to the approval of the site for facility no. 2 by letter dated July 17, 1979.

47. PennDOT subsequently purported to adopt a

policy which would have the effect of excluding landfills within a 10,000 foot radius of an airport. The only documentation to which the Deputy Secretary of Transportation, who is responsible for the activities of the Bureau of Aviation, referred in formulating PennDOT's purported policy was FAA Order 5200.5. The only written embodiment of PennDOT's purported policy in opposition to landfills near airports is a letter dated August 15, 1979, from PennDOT Secretary Larson to Secretary Jones of DER.

48. PennDOT has neither advertised nor held hearings in conjunction with the adoption of the purported policy contained in the letter dated August 15, 1979, nor does PennDOT have rules or regulations concerning the siting of landfills near airports.

49. PennDOT's change of position from the letter of July 17, 1979 was based in part upon contract by the duPonts and Representative Pitts at a meeting on August 9, 1979 with the Deputy Secretary of Transportation.

50. None of DER's review letters to PEMS mentioned the issue of potential bird hazards to aircraft. Aside from the issue of potential bird hazards, DER had concluded as of September 7, 1979 that PEMS' application met all of DER's regulations with respect to the issuance of a solid waste permit.

51. The main reason for denying PEMS' application was the position taken by PennDOT in its letter dated August 15, 1979.

52. The Milliken Sanitary Landfill, located in San Bernadino County, California, serves an area having a population of over 200,000, has a working face measuring 300 feet by 300 feet, operates from 8 a.m. to 5 p.m. six days a week and receives an

average of 1,500 tons of trash per day. Its required daily cover is 6 inches, with a final cover of two feet. The nightly cover is 6 inches.

53. The FAA objected to the proposed expansion of the Milliken Sanitary Landfill on the ground that it would pose a bird hazard for Ontario International Airport, also located in San Bernadino County, California. The end of the nearest runway is about 5,200 feet from the expansion site.

54. Since the institution of the bird management program at the Milliken Landfill, San Bernadino County has received no complaints from either Ontario International Airport or the FAA, and most significantly, no complaints about bird problems.

## DISCUSSION
### Burden of Proof

The burden of proof at the hearing in this matter was placed upon appellant, Pennsylvania Management Services, Inc. (hereinafter; PEMS). Our rules provide at 25 Pa. Code §21.101(c)(1): "(c) A party appealing an action of the Department shall have the burden of proof and burden of proceeding in the following cases unless otherwise ordered by the Board: (1) refusal to grant, issue or reissue any license or permit." Notwithstanding our application of the above rule, appellant argues that the burden should be placed upon DER and intervenors because the basis for the permit denial is the allegation that the location of the landfill near the airfield will create a birdstrike hazard condition. Appellant argues, with some justification, that inasmuch as DER is asserting a public nuisance, it should bear the burden of proof, rather than placing appellant in the position of having to prove a negative, i.e., that

the landfill will not create a public nuisance. We believe, though not without some reluctance, that appellant overstates the case. Actually, appellant seems more concerned with the nuisance doctrine than are DER or intervenors. They also take the base position that under the language of the Pennsylvania Solid Waste Management Act[1] of July 31, 1968, P.L. 788, 35 P.S. §6007(e), DER has the authority to consider every aspect of a proposed landfill, and must deny the permit where it believes health, or safety of citizens will otherwise be impaired. Appellant, PEMS, is really not disputing[2] the fact that a bird hazard would be created *but for* its intended program of bird control. It then seems proper that appellant go forward with the burden of proof on this issue. The real dispute in this case is whether or not PEMS can, in fact, control bird populations on its landfill, to the necessary degree.[3] We have reviewed DER v. Glasgow Quarry, Inc., 3 EHB 308, 23 Pa. Commonwealth Ct. 270, 351 A. 2d 689 (1976); Diehl v. DER, EHB 78-037-B, 1979 EHB 105, and other cases cited by appellant and conclude that they offer no support contrary to our decision.

Much of the testimony presented at the lengthy hearing held in this matter was offered to show that the location of a landfill near an airport could or

1. The act was repealed by the new Solid Waste Management Act of July 7, 1980, P.L. 380, 35 P.S. §6018.101 et seq., which has an effective date of August 1980.

2. We do not know, but assume that even appellant would agree that a permit would properly be denied. if it were not willing to make some effort to control the bird population.

3. We will, of course, discuss further the implications of this term, later in this adjudication.

would attract birds of various kinds[4] and create a hazard to aircraft.[5] As previously indicated, we are satisfied that this is true as far as it goes. We believe the real issue, however, must be joined on the question of whether the bird management program proposed by PEMS is sufficient to justify the issuance of a solid waste permit. Having listened to many eminent authorities and detailed expert testimony on birds, their habitat and propensities, we conclude that no one can presently say with absolute assurance that the proposed bird control program[6] will or will not succeed at New Garden Facility no. 2. We come then to the real nub of this controversy. Is the interim risk to life and limb so great from a birdstrike at this proposed landfill that it would be unreasonable to allow PEMS the opportunity to demonstrate that it can control the bird population at the site? The evidence of birdstrikes does command our attention and grip our emotions because it is so dramatic. The term itself conjures up horrible images and could very easily lead one to say that *any* risk is too great. The fact is, however, that there are and will be birds in the area from time

4. The kinds of birds that might appear at some time at the landfill are: Herring gulls, ringbilled gulls, laughing gulls, great blackbacked gulls, blackbirds, starlings, grackles, cowbirds, cattle egrets, crows and Canada geese.

5. A bird can be sucked into the engine or damage a propeller and cause the plane to lose power, and other damage to the aircraft is possible.

6. Or one that may grow out of the various combination of control methods. Perhaps only God has the power to guarantee a birdfree sky. PEMS here made no such impersonation. Indeed, some might even be so bold as to argue that birds have as much right to the sky as airplanes.

to time regardless of our decision.[7] We cannot help but note, in our effort to bring some objective reality to the situation, that there was only one major birdstrike incident mentioned which led to the loss of life in the United States.[8] This must be consid-

---

7. A revealing discussion on this point took place at the hearing when Mr. Godin of the Fish and Wildlife Service testified:

"A  The second part of your question was about bird hazards. It only takes one bird to bring down an aircraft, so if they use all of these techniques at the dump and if they repel all of the birds, all of the birds, then that is effective.

But if there is one or two birds that remain, and if one of those birds collides with an aircraft, then it is not effective.

THE EXAMINER: Can anything ever be effective, because there are always going to be birds everywhere?

THE WITNESS: That is correct.

THE EXAMINER: Then nothing is effective ever to prevent hazards to aircraft?

THE WITNESS: That is correct.

THE EXAMINER: Whether there is a landfill there or not?

THE WITNESS: But a landfill would attract the birds at the airport.

THE EXAMINER: The problem is with your logic it seems to me if you say that only one bird is all you need—and you are going to have one bird whether there is a landfill there or not; so therefore nothing can prevent the hazard to aircraft. If your logic is then, therefore, there is always going to be a hazard, then it isn't the landfill that is doing it necessarily. It is just the fact that there are birds in the world.

THE WITNESS: That is correct."

8. On March 10, 1962 62 persons were killed in a crash at Logan Airport in Boston when Lockheed Electro turboprop struck a flock of starlings. There have been as many as 770

ered along with the knowledge that there are hundreds of flights and countless millions of birds in our skies on a daily basis.

Intervenors have placed great weight on Federal Aviation Administration (FAA) Regulation No. 5200.5 which indicated a policy against having airports being located within 5,000 feet of a landfill.[9] Appellant points out correctly not only that this regulation does not govern the DER but also that a more logical place to look for federal guidance is section 8002(k) of the Resource Conservation and Recovery Act of October 21, 1976, 90 Stat. 2831, 42 U.S.C.A. §6982(k). This simply sets a policy to further study the problem of landfills in close proximity to airports.[10] It appears that the single most important factor which led DER to deny the permit here in question was a letter received from the Secretary of PennDOT on August 15, 1979 which for the first time outlines a policy similar to that of the FAA for Pennsylvania. We are also convinced that the single most important factor which led

---

birdstrikes reported by aircraft in 1978. It does not appear that these were in any way related to landfill operations, and although there were injuries, fortunately there was no loss of life.

9. The 5,000 feet limit is from the runway and applies where airplanes of the type here in question are in service.

10. Classification of Solid Waste Disposal Facilities and Practices, codified at 40 C.F.R. Part 257, EPA states that " . . . it should be made clear that neither this regulation nor the proposed standard prohibited the disposal of solid waste within the specified distances [of 10,000 and 5,000 feet]. Instead, the distances define a 'danger zone' within which particular care must be taken to assure that no bird hazard arises."

PennDOT to enunciate this new "policy"[11] was a meeting which intervenor Alex duPont and Representative Pitts held with the Deputy Secretary of PennDOT on August 9, 1979 at which neither appellant nor his representative were present.

Appellant has outlined an impressive array of techniques which it intends to employ in the battle of the birds.[12] Intervenors, DER and their experts

---

11. Less than one month prior to this meeting, PennDOT had advised DER:

"In reply to your recent request for a statement of the Bureau of Aviation's position pertaining to the proposed landfill in the close proximity of the New Garden Flying Field at Toughkenamon, Pennsylvania, the Bureau's position is as follows.

"The Bureau of Aviation believes Site #1 presents a hazard to the airport because of its location in the approach and departure lanes of the runway. Based upon information available to date, the Bureau does not object to the approval of Site #2. However, although specific hazard information is lacking; landfills anywhere in the vicinity of airports should be discouraged due to the lack of precise information on which bird activities may be predicted."

There was no promulgation of a regulation in accordance with the public documents law, nor notification in the Pennsylvania Bulletin.

12. PEMS proposes a bird management program for facility no. 2 which utilizes the following techniques: (1) limiting the daily working area to half an acre initially, with possible future expansion to at most one acre; (2) compacting and covering the refuse as soon as possible; (3) covering the working area daily with six (6) inches of subsoil; (4) avoiding open bodies of water by including the use of enclosed holding tanks for wastewater; and a combination of; (5) sonic deterrents (including shell crackers, whistle bombs and distress calls); visual deterrents (such as mounts of birds in distress, flashing lights, metal reflectors and silhouettes of birds of prey); lethal control (e.g. shotguns); and modification of habitat, so as to

have assembled an equally impressive list of reasons why they believe the project is doomed to failure—no matter how hard PEMS might try. As previously indicated, reasonable minds can differ on who will ultimately be right, but there should be no disagreement on whether PEMS has proved by a preponderance of the evidence, that such control *can* be exercised. We believe the interim risks to be minimal to non-existent because it will early appear whether appellant meets success or failure. If success comes, there will be no problem; if failure, we have no doubt that intervenors will waste little time in noting this fact and bringing it to the attention of DER. DER is, of course, authorized to revoke this permit under proper circumstances and order the closure of the landfill.[13] With this in mind, the risk of failure is placed squarely upon PEMS, where it belongs. The most difficult problem which we can foresee will be faced by DER in determining whether the birdstrike hazard is reduced to the necessary degree. It is unrealistic to expect that there be *no* birds in the area. At the same time we can find no absolute numerical standard which can be applied to the situation.[14] We must, therefore,

---

remove sites for roosting, nesting and resting, by eliminating tree cover and farming operations and planting low vegetation.

The simultaneous use of several different control methods is proposed to prevent birds from becoming acclimated to any one of them and to achieve permanent control.

13. Section 503(e) of the Solid Waste Management Act, 35 P.S. §6018.503(e). In addition, we will retain jurisdiction.

14. It is interesting to note, for example, that if we assume that the chances of a birdstrike are presently 1 in 50,000 and this risk is tripled, it is then only 3 in 50,000, which could still be well below the tolerable risk level. Therefore, simply knowing that the risk has *increased* is not enough information.

look to the public nuisance doctrine.[15] A nuisance is "[a]n unreasonable use of property which causes injury or damage to another in the legitimate enjoyment of his rights of person or property. 28 P.L.E. §1, Alexander v. Kerr, 1828, 2 Rawle 83 Comm. v. Baird, 1958, 41 Erie 200." The distinction between a public nuisance and a private nuisance is that a public nuisance is common to all the neighborhood where it is committed, as well as those of the public who may be traveling in that vicinity. A private nuisance inflicts injury which is personal to the party complaining. We have no doubt that a public nuisance could be created, absent sufficient bird control measures at the New Garden Landfill. Here we are dealing with a situation where DER proposes, not to abate, but to *prevent* a nuisance from coming into existence. In this regard our cases have said that the threatened injury must be certain and not merely probable to warrant enjoining a nuisance: White v. Old York Road Country Club, 322 Pa. 147, 185 Atl. 316 (1936). It must clearly appear that a nuisance will necessarily result from the contemplated act which is sought to be enjoined. A court cannot anticipate an improper use of premises and sanction a restraining order founded on surmise and speculation as to future conduct: Essick v. Shiilam, 347 Pa. 373, 32 A. 2d 416 (1943); City of Erie v. Gulf Oil Corp., 42 Erie 98, aff'd 395 Pa. 383, 150 A. 2d 351 (1958); Knipple v. Stahler, 74 Dauph. 17 (1959). If and when a public nuisance is created that will be time enough to abate it. If an act or use can be carried on in a legal manner, a court

---

15. We also note that a public nuisance may give rise to a criminal prosecution 28 P.L.E. §273; Fabian v. Snyder, 78 York 59 (1964).

may, instead of prohibiting the act, prescribe necessary limitations. There is ample evidence that appellant PEMS can (whether it will, remains to be seen) control the birds at the landfill. This has been done with some success at the Milliken Landfill in California,[16] and we see no reason why a similar result cannot be attained here: Liddell v. Swarthmore Swim Club, 2 D. & C. 2d 468 (1954). The Milliken Landfill located 5,200 feet from the Ontario International Airport has successfully controlled the bird population through some of the techniques to be employed at New Garden. Thus, we conclude that DER should not have denied the permit sought by PEMS based only on the possibility that a nuisance might be created at the landfill site at some unspecified future time.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and subject matter of this appeal.

2. Under 25 Pa. Code §21.101(c) the appellant has the burden of proof on the issue of whether its proposed bird control techniques can prevent any hazard to aircraft in the area of the landfill.

3. Federal Aviation Administration (FAA) order No. 5200.5 regarding airport siting is advisory only, and it has not been properly adopted as a regulation by either DER or PennDOT.

4. The bird control techniques proposed by appellant, PEMS, have a reasonable chance of success, and the interim risk is very low. If they are unsuccessful, DER and intervenors have an

---

16. The bird management program has been conducted since 1977 and the landfill has experienced almost a total elimination of its bird population.

adequate remedy under section 503(e) of the Solid Waste Management Act, 35 P.S. §6018. 503(e).

5. A public nuisance is created by an unreasonable use of property which causes injury or damage to others in the legitimate enjoyment of rights of person or property.

6. If and when a public nuisance is created by PEMS due to birds, DER is authorized under the Solid Waste Management Act of 1980 to revoke the landfill operation permit and order proper closure.

7. Appellant, PEMS, has carried the burden of proving that it can control birds at its landfill operation at New Garden Site no. 2 in a way that will prevent a birdstrike hazard or a public nuisance.

## ORDER

And now, February 13, 1981, the appeal of Pennsylvania Management Services, Inc. to no. 79-153-W is hereby remanded to DER for further action consistent with this adjudication. The board will retain jurisdiction.