Tilghman C. J.
This ejectment was tried in the Court of Common Pleas of Mifflin county, where the plaintiff obtained a verdict and judgment. In the course of the trial, the defendant’s counsel asked the opinion of the court on eight points, which, together with the opinion on each of them, are placed on the record. The whole evidence in the cause is also on the record. I will consider each opinion in order.
1. The court declared their opinion, “that an improve- “ ment made upon land not purchased by the late proprieta- “ ries from the Indians, gave no title in law or equity.” In this they were clearly right; but they went on to say, that if the jury should be of opinion, that James Kyle, the lessor of the plaintiff, had acquired title to the land in question, by an actual residence thereon, after the proprietary’s purchase from the Indians, in February, 1755, then the law respecting an improvement on Indian lands, would be immaterial in this cause. To understand this opinion, it must be recollect-^ ed that Kyle had been settled on the land in dispute, before the purchase of 1755. The jury then must have been led to take the law, that if Kyle had continued to reside on the land until the time of, and after, the purchase, he acquired a title. This is the sense in which I understand the court, and I am disposed to give to their expressions the most liberal construction. I presume that the plaintiff’s counsel consider the opinion in the same point of view as Mr. Burnside has contended, that a continuance of residence to the time of the purchase gives title. To this I cannot agree. A settlement upon Indian lands was forbidden by positive law,- as well as *519 by justice and good policy. How can it be that right should spring from a continuance of wrong ? If the settlement was originally illegal, at what moment did it acquire a legal character ? The proprietaries held out encouragement to persons who settled on lands which had heen purchased from the Indians, but they never encouraged settlements on unpurchased lands. On the contrary, they were forbidden under penalties, and by public proclamation. Were the proprietaries obliged then to reward those wrong-doers who had settled on the Indian lands, and continued the wrong to the time of the purchase, by a grant of the land on which they had intruded ? The question is too plain to admit of a doubt. Not only had they a right, but it was almost a duty, to reject the application of such people, and grant the land to others who had not violated the law. The court was wrong then, in intimating to the jury that a settlement made before the purchase, and continued till after it, could give title.
2. The second question proposed to the court was, whether Kyle’s taking a warrant, 3d June, 1762, without calling for his improvement, was not a relinquishment of all pretension to an equity founded on his improvement. The court answered, “ that it was not conclusive evidence of a relin- “ quishment,” and I agree with them. It is evidence, and strong evidence, that it was not intended to include the improvement, but the matter admits of explanation. In Bonnet’s Lessee v. Diffenbach it was decided, that the improvement was not relinquished, although not mentioned in the warrant, because satisfactory reasons were given for its not being mentioned. The reasons there were much stronger than in this case, but that is immaterial. It is the principle which is now to be decided. What shall be a sufficient reason for not mentioning the improvement, is matter of evidence; whether you shall be suffered to give any reason at all, is matter of law. I am of opinion, that the court were right in deciding, that the' omitting to mention the improvement was.not, ipso facto, a relinquishment.
3. The third question was, whether the promise of secretary Peters to William White, the warrants granted in pursuance of that promise, and the survey thereon, before any application for a warrant by Kyle, is not such a grant of the-land contained in the survey, as will bar any subsequent grant to a person having notice of that survey. The court *520 answered, “ that the jury were to judge whether there was “ such a promise; and if there was, what was the extent of u ancj v/hether or not it included the land in question.” I see nothing wrong in this answer. In my opinion, the question proposed to the court was much too broad. It embraced matters of fact, which were not for them to decide. The opinion of the court should not be asked, but upon specific facts, either granted or supposed. The facts may be agreed by the counsel on both sides, and the court may be asked to direct the jury as to the law, supposing the jury shall be of opinion the facts are in a certain way. In such case, it will be the duty of the jury, first to settle the fact, and then apply' the law. But when the court are called upon to declare what is the law upon the whole evidence, they are not bound to answer, because they cannot answer without deciding the fact.
4. The fourth decision was, “ that the sale by Henry New-kirk to the plaintiff in 1754, was of no avail in law or equity. Of this the defendant has no cause to complain, because it is in his favour. And the law is clearly so. Newkirk being a settler on Indian land, had no right himself, and therefore could convey no right to another.
5. The fifth question was, whether the decision of the board of property could have any avail against two verdicts and judgments in courts of law. Answer — “That the deci- “ sion of the board of property had no conclusive operation, “ but was entitled to such weight as the jury might think it “ deserved.” If the decision of the board of property was to have no weight, it ought not to have been admitted as evidence. • The receiving it as evidence is an admission that it is entitled to consideration. The decision of the board is at least some evidence of the custom and practice of the land-office, on which the foundation of many titles rest, and on which the defendant rests his title, for the whole law of improvement and settlement is derived from it. It is also of avail in the same manner as the two verdicts and judgments are ; that is to say, it shows the opinions of persons deciding upon a matter submitted to them by the law of the country.! But it is not conclusive. The jury are to determine the weight of it.
.. '6. The court was next asked, whether two verdicts and judgments, in favour of the defendants, or those under whom. *521 they claim, and seventeen years acquiescence by the plaintiff, are not a bar to this ejectment ?■ Answer — ■“ They are not a bar and certainly they are not. Nothing less than 21 years adverse possession is a bar, by our act of limitations. It is not pretended, that the plaintiff’s action is barred at law, but it is said, that under the equitable circumstances of this case the plaintiff ought not to recover. To enter into all the equitable circumstances of the case, is going into a wide field indeed. And these circumstances are composed of facts, which the court have np power to decide. But the question, as I take it, is whether the plaintiff’s delay of his suit for seventeen years after the last verdict and judgment, is not a flat bar to this action ? No equitable circumstance is stated or referred to. The answer therefore'is plain ; nothing short of twentyrone years is a bar.
7. The seventh question was, whether the judgmenhof the Supreme Court, in point of law, founded on the same facts as are now in evidence, is not a rule of property binding on. this Court. The court answered, nearly in the words of the question, “ that the judgment of the Supreme Court, on pre- “ cisely the samé facts, was a rule of property, by which they' “were bound;” but added, “that the jury were to decide “ whether the facts were the same.” I perceive no error in this answer. The jury had a right to judge whether the facts were the same ; indeed no other persons could judge.
8. The eighth and last question was, whether any interest could be derived by the deed from George Gabriel to the plaintiff, from all the testimony disclosed in this cause. To so general a question, depending on facts not specified, the court might very properly have refused an answer. But they thought proper to give an answer, which must be considered. To understand the answer, however, the evidence to which it refers must be stated. The land in dispute was included in the Indian purchase of 1755. Long before that purchase, about the year 1743, Mr. Secretary Peters, with the sheriff of Lancaster county and some magistrates, went, by order of the governor, to remove a number of persons, who had given offence to the Indians by settling on their lands. The people were convened, and, in order to induce them to leave their settlements, the Secretary promised, that when the proprietaries purchased of the Indians, their improvements should be granted to them. *522 There was some evidence that Gabriel was among these set-tiers, and, to make the case as strong as possible for the pia;ntiffs, \ve -will suppose that he was. On 6th July, 1754, the proprietaries obtained a deed of conveyance from the Indians, which was recorded February 3d, 1755, and on the same day the land office was opened for the sale of the newly purchased lands. It does not appear, that Gabriel ever applied for a wárrant in pursuance of Mr. Peters’s promise, or that he lived on the land after the opening of the office ; but on 27th September, 1766, in consideration of 5 pounds, he conveyed his interest to the lessor of the plaintiff. Now the opinion of the court was, “ that the answer to the de- “ fendant’s question depended upon certain facts, which the “jury were to decide. If the jury should be of opinion, from “ the evidence, that Gabriel had an interest in the land, and “ particularly, that he was included among those settlers “that were promised their improvements by Mr. Peters, “ then there may be an interest derived by the deed of Ga- “ briel to the plaintiff.” We have here certain facts stated by the court, on which they gave an opinion of the law; this opinion was, that a rightmight remain, in the year 1766, in Gabriel, in consequence of Secretary Peters’s promise in 1743. In this I think they were wrong. It was incumbent on Gabriel to enter an application, in a reasonable time after opening the land office in 1755. But there is no evidence of his ever applying. And even if we are to consider his sale to Kyle as an evidence of a pursuit of his right, eleven years elapsed between the opening of the land office and that sale. He was under no obligation to claim the right of pre-emption promised by Mr. Peters, and it would be altogether unreasonable to hold the proprietaries bound to keep the land vacant for an indefinite period of time, because possibly Gabriel might think proper to ask a performance of the Secretary’s promise. Cases depending upon the same principle have been decided before. Persons who had settled on the Indian lands, by permission of the commanding officers of the king’s armies, were promised by the proprietaries to be confirmed in their settlements, because settlements of that kind were for the defence of the country. It has been held, that the right of pre-emption in these cases was lost, unless application was made in a reasonable time after the opening of the land office. What was reasonable time has not been *523 precisely ascertained, nor can any one rule apply to all cases. But the court has judged of it, as matter of law ; and the time has never been extended to any thing like what would be necessary to preserve the right of Gabriel in the present instance. I refer to the cases of Plumsted's lessee v. Rudebagh, Todd's lessee v. Ackerman, and Gratz’s lessee v. Campbell, (2 Smith's Laws, 127, 128, 129,) in the last of which it is said, that it was incumbent on the party who had obtained a military license, as it was called, to apply for an office right at the opening of the land office, on 3d April, 1769, or in a reasonable time afterwards; and that no case had yet gone further than to extend the time to the month of July following. The land in dispute, in that case, was not within the purchase of 1754, but of November, 1768. I am therefore of opinion, that on this point the decision was erroneous. On the whole then, my opinion is, that the judgment of the Court of Common Pleas should be reversed, and a venire facias de novo awarded.
Ye ates J.
It is often difficult, and sometimes absolutely impossible, to efface wholly from our minds, the impressions made on them in early life. In this predicament, I feel that I stand on the present occasion. I was, together with Mr. Wilson, of counsel with James Kyle, when the ejectment for the lands in question, came on for trial in the Court of Common Pleas of Cumberland county, at the suit of John Calhoun, in April Term, 1770. The transactions which gave birth to the controversy were not at that time of long standing ; the witnesses were examined openly viva voce; and the struck jurors, formed of some of the most respectable freeholders of the county, had the advantage of a viexv of the premises in dispute. The then plaintiff recovered. I was afterwards present in May, 1773, at a Court of Nisi Prius in Carlisle, when in a new suit brought by Kyle against Calhoun. the defendant obtained a verdict which received the sanction of this Court. We are not, however, now called upon to decide on the relative merits of the two conflicting titles, as on a motion for a new trial. Our business as a court of error is to inquire, whether the answers given by the Court of Common Pleas of Mifflin county, to the questions proposed to them by the counsel of the plaintiffs in error, were correct or incorrect in point of law. I feel it to be my bounden *524 duty to treat those answers with all imaginable fairness and * candour, according to the plain and natural import of the worcjs jn which they are couched. The court below were not obliged to answer complicated questions of law and fact,— for this would be a direct usurpation of the rights of jurors. Ex facto oritur jus. But legal questions on facts admitted or ascertained by evidence relevant to the cause, and material to its decision on its true merits, it is the duty of the court to answer ; for otherwise the streams of justice would not flow in their usual and accustomed channels. • If matters of mere law are left to the decision of jurors without controul, we shall soon lose sight of all certainty and uniformity. If, however, the points proposed are decided legally by the court below, although a wrong reason be assigned for the decisions, a court of error will not on that ground reverse the judgment.
With these general remarks, I shall proceed to consider briefly the answers of the court.
Their first answer to the question immediately put to them, I take to be correct: but when they go on and instruct the jury, that the point of going upon the land before the Indian purchase, was an immaterial consideration, if they should believe that Kyle had acquired title to the land after the purchase by actual residence, previous to the survey made for White, it manifestly tended to mislead the jury. The persons' who settled on the Indian lands on the north side of funiata, in defiance of the acts of the legislative and executive branches of the government, gained no title thereby: their equity was derived from the relinquishment of their possessions, and a reliance placed, on the promises of the proprietary agents. The proposition generally laid down by the court, implies their opinion, that a settlement commenced before the sale by the aborigines, and continued down to the opening of the office, conferred a right, to which I cannot give my assent. At all events, the law on this subject was laid down too loosely ; and it was plainly erroneous, in limiting the title of the defendant below, to the time of survey made for White, when it is admitted on all hands, that he likewise derived an equity from giving up his early possessions under the promises of Mr. Secretary Peters. I see no errors in the answers to the 2d, 3d, 4th, 5th, 6th, and f'th questions, although I will not assert that I concur in *525 the system of reasoning adopted therein throughout. But the answer to the 8th question, appears to me to be clearly erroneous. When George Gabriel quitted the possession of the land held by him, we know not. James Galbraith, Esq. the sheriff of Lancaster county, testified on the first trial, that Gabriel did not leave his place with the Germans, after the promises made by Mr. Secretary Peters: and we know with certainty, that he took out no warrant, if he was at one time entitled to the benefit of the promises, which had been made to the settlers. How long were the proprietary officers to wait for the fulfilment of their engagements ? Must the lands remain vacant for years, until the settlers should think proper to apply for the benefit of pre-emption ?. This question has been put to rest by repeated decisions. The members of this Court fully considered the point in this very cause, (5 Binn. 164, 165.) Their decision was, that Gabriel, by not making application for a warrant, within a reasonable time after the opening of the land office in February, 1755, lost the benefit of the promise, and that in no point of view could Kyle attach the improvement of Gabriel to his warrant of 28th October, 1/65. In fact, the counsel of the defendant in error have explicitly stated, that they disclaim all right whetever, under the bills of sale from Henry Newkirk and George Gabriel to James Kyle; and that those instruments were read to the jury merely to ascertain dates, and thus explain other facts in the cause. This admission is directly opposed to the opinion of the court below, in their answer to the last question proposed to them. Upon the whole, I am of opinion, that the judgment of the Court of Common Pleas be reversed, and a new trial be awarded.
Brackenrtdge J. delivered an opinion contra, which the reporter has not been so fortunate as to procure.
Judgment reversed..