## ¡ Rhodes *against* Frick.

A father having made a parol agreement with his son to convey to him his life-estate in a tract of land for a valuable consideration, the tenant, residing upon the land, attorned and paid rent to the son, who afterwards, with the knowledge of, and without objection by, the father, for a valuable consideration conveyed it to a third person; it was *held*, that the statute of frauds and perjuries would not prevent the alienee of the son from recovering the lands from the father, in ejectment.

ERROR to the common pleas of *Northumberland* county.

This was an action of ejectment for one hundred acres of land, by Henry Frick against Joseph Rhodes and Abraham Troxall.

Andrew Shoub died seised of a tract of land containing two hundred acres; by his will and an agreement among his heirs, the same became vested in his daughter Mrs Rhodes, the wife of Joseph Rhodes, the defendant; she died leaving an only son, Andrew S. Rhodes. When Andrew became of age, he conveyed the upper half of the land to his father Joseph Rhodes, who at the time was tenant by the courtesy of the whole. After this convey-ance, there was evidence that the tenant held the lower half under Andrew, who received the landlord's share of the proceeds. The deed from Andrew to his father stated the consideration to be 2000 dollars. There was an incumbrance upon the land to the amount of 442 dollars 72 cents in favour of some of the other heirs of Andrew Shoub, which the father paid; and there was evidence of his having paid other debts of the son. The plaintiff, Henry Frick, purchased the lower half of the land from Andrew, and alleged, that when the son conveyed to the father the upper half of the land, upon which the buildings were erected, the father had relinquished his life-estate in the lower half to the son; and, although the same tenant continued to occupy the whole farm, yet he, with the consent of the father, became the tenant of the son as to the lower half, and paid the rent to him. When Henry Frick, the plaintiff, purchased the land in dispute from the son, he called upon the father and informed him of it; the father made some objections to the terms of the sale, in consequence of which they were changed; he gave no notice of any claim of his own to the land; and there was much other evidence of the con-duct of the father, tending to show that he had no objection to make to the sale, some of which evidence is more particularly stated in the opinion of the court.

The only important points in the cause arose out of the following positions taken by the counsel of the defendants, and the answers of the court to them.

[*Rhodes v. Frick.*]

" That there is no evidence from which the jury ought to infer, that a partition of the two hundred acres was made between the defendant and his son, in pursuance of any contract or agreement made between them for the sale of the life-estate of the defendants in the tract in dispute, and that any marks made on the ground, as evidence of division, were, for the purpose of designating the tract conveyed by Andrew to his father."

" That if the jury should believe there was a parol partition between the father and son, the case is still within the statute, unless taken out by some act or acts of the son, such as the payments of money, making improvements, paying taxes, &c., and that possession alone is not sufficient."

To which the court answered:

Lewis, president.   There is no evidence of any marks having been made upon the ground, as evidence of division, but if the division is established, the jury may infer, that the parties adopted the line of division contained in the deed from Andrew to his father.   The court cannot assent to the position contained in this point, to the extent therein claimed, but, on the contrary, instruct the jury, that if they believe there was a parol partition, by which the son conveyed the upper part to the father, and the father gave up all his right and possession in the lower half to the son, possession alone in such a case is sufficient to take the case out of the statute.   The conveyance of the estate in remainder by the son, is tantamount to the payment of the purchase money, if it formed the consideration for the partition.   The court cannot instruct the jury, that there is no evidence from which the jury ought to infer a partition of the two hundred acres, as requested.   From the testimony of Jacob Kline, Richard Goodman and Amos Witter, the jury may infer a partition or division between the father and son. From the evidence of Abraham Stroub, Joseph Hogendobler, John Sybert, Thomas Allen and George Berryman, the jury may infer the possession of Andrew by the attornment and payment of rent by Troxall the tenant; and from the testimony of Jacob Kline, Richard Goodman and William Tilman, the jury may infer that the attornment and payment of rent was known to Joseph Rhodes, and assented to by him."   Here the court brought into the view of the jury, the evidence of the witnesses above referred to, tending to show the facts above stated, and refused to withdraw the same from the consideration of the jury, by the declaration, that it was no evidence of partition if the two hundred acres as requested by defendants' counsel, but submitted the whole to the jury as evidence, from which they might find such partition, possession by attornment, and payment of rent.   The evidence of Isaac Husel was also brought into view, as showing, that after Andrew had written so many orders, (in 1834,) the miller was prohibited by Joseph Rhodes from delivering any more grain except upon the orders of Joseph Rhodes himself.

[Rhodes v. Frick.]

*Jordan* and *Ellis*, for plaintiff in error, cited 5 *Watts* 308; 3 *Ves* 712; 3 *Penns. Rep.* 332; 2 *Whart.* 387; 3 *Serg. & Rawle* 543; 5 *Watts* 386.

*Donnel* and *Hepburn*, contra, whom the court declined to hear.

The opinion of the Court was delivered by

HUSTON, J.—The object of all civilized legislatures, and of all courts, is to do justice between man and man; to prevent an undue advantage by the more skilful or crafty, from causing ruin to the ignorant or unsuspecting.   To confine our remarks to the transmission of the title of lands, from one person to another, the mode has not only varied, but at different periods been the reverse of that shortly before in common use.- Actual delivery of possession in the presence of the neighbours, called livery and seisin, was long the most usual and most effectual mode of transferring lands.   This, at first, rarely, and then generally, was accompanied by a written deed; at length, during the reign of Charles the second, an act of parliament required a writing in almost all cases.   And on the 23d of March 1772, it was enacted in this state, (then province,) that all laws, estates, interests of freehold, or terms of years, or any uncertain interest of, in, or to any messuages, manors, land, tenements or hereditaments made and created by livery and seisin only, or by parol, and not put in writing and signed by the parties so making or creating the same, or their agents thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not either in law or equity, be deemed or taken to have any other or greater force or effect, any consideration for making such parol leases or estates, or any former law or usage to the contrary notwithstanding.   The English and American acts of the legislature, are each entitled, an act to prevent frauds and perjuries.   These enactments, like some provisions of the much and often justly eulogized common law, had one radical fault. They were inconsistent with the nature of man, who, whatever theorists and speculative philosophers may dream, can never be brought to act at all times according to any one given rule.   Believers in the perfectibility of human nature, and of human enactments, need only review the judicial history of England and this country, as relates to the laws in question, to learn that, what from ability, address, influence, fraud or imposition on the one side, and dulness, ignorance, fear of offending, or honest unsuspecting confidence on the other, any given rule will be productive of the most monstrous injustice.   It would have followed from the above law, that any written deed, was final and conclusive, as to all contained in it, and all left out of it, and if to what is said above, as to the parties, you add all the evils which would occur from not stating the contract fully and distinctly to the scrivener, from his not comprehending fully what was stated, from his inability to express

clearly, from his ignorance how to express legally, from his mistakes, to say nothing of fraud, we would have a system which would soon be found intolerable. And it has been, and will be, a part of the business of the courts, or of some of the courts of every country, to decide on contracts not evidenced in the most formal manner, or not expressed, so as to show the real intention of the parties.

Questions on parol contracts for the sale of land, arose soon after the passage of the statute of Charles; I shall not go through the cases. Each depended much on its own circumstances; different chancellors viewed the matter in different aspects; and in more than one instance, the same chancellor changed his opinion; "this court," said Lord Thurlow, 2 *Brown Ch.* 566, "laid down two exceptions, by which, if they are to be sustained, it amounts to the same thing, as if the statute had made the exception of the two cases, that is, where the agreement is confessed by the answer, or where there is a part performance. The first of these, has been questioned; as to the second, it stands yet, if we add to it, that a case must be shown in which there is fraud in refusing to comply on the other part. Lord Hardwicke puts the following strong case: "suppose a man is lending money, and an absolute deed is to be made, and he to execute a defeasance on being repaid; and when the deed to him is executed, he refuses to execute the defeasance; will not, says he, this court relieve against such fraud?" And again, he says, "when one part of the agreement has been performed by one party, it is but common justice, that it be carried into execution by the other." 2 *Atk.* 99, 100; 3 *Atk.* 1.

I shall pass over the much contested question, whether payment of money alone can take a case out of the statute; but if fraud is the ground of relief, there may be easily conceived cases where a vendor has received money and spent it, or paid his debts with it, and where there can be no adequate relief to the purchaser, but specific performance by the vendor.

I shall rely on our own cases, because, if they are uniform and have formed a basis of contract and title, we cannot safely vary from them; because of an act of our legislature, which seems to have a most material bearing on such cases.

The case of Thompson v. White, 1 *Dall.* 426, was decided on the act above cited, and is very strong; for not only did the estate pass on parol evidence, but it passed in opposition to a written regularly executed deed. I pass over Eberd v. Wood, 216; Seyler v. Echerd, 1 *Binn.* 378; Billington v. Welsh, 5 *Binn.* 131; in each of which, the same doctrine is laid down; in Smith v. Patton, 1 *Serg. & Rawle* 80, 3, where this doctrine was fully argued and considered, " although the act against frauds and perjuries," says Tilghman, C. J., " declares that, no estate greater than a lease at will, shall pass without a written contract, yet it has been repeatedly decided, that no man shall convert into an instrument of fraud,

that law, which was made for the purpose of preventing fraud. No man shall reap the fruits of a contract for the sale of lands, and afterwards annul the contract; he shall not permit the contract to be executed in part, and then refuse to execute it in whole." In page 85, YEATES, J., says, " it is too late to inquire at this day into the propriety of our adoption of the British decisions, that agreements as to lands in part executed, are taken out of the statute of frauds and perjuries. Statutes made to prevent frauds, were not designed to protect them." I shall content myself with referring to the cases cited by Mr Wharton. 1 *Wharton's Digest*, title " Frauds." The case of Clark *v.* Vankirk, 14 *Serg. & Rawle* 354, and same case again, 16 *Serg. & Rawle* 286, called for a full consideration of the subject, and resembled the one before us in this; the contest was not between the parties to the parol contract, but between vendor and the purchaser of the interest of the vendee, by parol. In connection with these decisions, we must consider the act of the 10th of March 1818, which provides that, " when any person shall claim title to any land or tenements within this commonwealth, by virtue of any *parol* contract heretofore made, or hereafter to be made, with any person or persons who have contracted or shall hereafter contract, to convey such lands and tenements to him, her or them, or to any person or persons, whom he, she or they may represent, when such contract shall have been so far in part executed, as *to render it unjust to rescind the same,* and which contract shall not have been complied with in the lifetime of the person or persons, who may have heretofore contracted, or shall hereafter so contract, if no sufficient provision for the performance of such contract, appears to have been made by the deceased, then the person or persons claiming under such parol contract shall present a petition, describing the property, and stating the terms of the contract, and praying the court to appoint a day for the examination of witnesses in support of such contract; and if the court shall be of opinion that the case disclosed, *doth not come within the meaning of an act of assembly,* entitled, " an act for the prevention of frauds and perjuries," passed the 21st of March 1772, they shall grant a subpœna for the witnesses. It then directs such proceedings, that if a proper case is made out, the court are to decree a deed to be executed, which shall pass the estate as fully as if the deceased had conveyed in his lifetime. And by the 18th section of the act of the 24th of February 1834, a similar provision is made, in all cases where such parol contract shall have been so *far executed, that it would be against equity to rescind the same.* These express enactments have so far sanctioned the practice and decisions of our courts, that the judges are expressly authorized and directed to consider certain parol contracts not within the meaning of the acts of 1772, and would seem to remove all scruples of such as affect to be alarmed at courts repealing a law.

We come now to the case before us; Andrew Stroub, formerly of Milton, died, leaving a large estate. One of his daughters married Joseph Rhodes. A tract of land situate on the northeasterly side of the west branch of the Susquehanna, was, under the will and an arrangement among the heirs of Andrew Stroub, allotted to Mrs. Rhodes, and she was to pay 442 dollars 72 cents, to the other heirs, or some of them. Mr Rhodes and wife took possession in 1807, and Mrs Rhodes soon after died, leaving an only son, Andrew S. Rhodes.

Some years after Andrew became of age, he conveyed the upper half of the farm to his father, Joseph Rhodes, who, as tenant by the courtesy, had a life estate in the whole, and who, until that time, the 12th of December 1831, had leased and received the rent of the whole. After this conveyance, there was evidence, that the tenant held the lower half under Andrew, and paid or delivered the landlord's share of the grain to Andrew. The consideration in the deed from Andrew to his father, was, in the deed, stated to be 2000 dollars. The father paid the debt to the other heirs and interest, which had been suffered to accumulate, though the father ought to have kept down the interest, and also had paid some other debts for the son; the amount did not appear.

The allegation of the plaintiff, who had purchased the lower half of the tract from Andrew, was, that, at the time when the son conveyed to his father the upper half of the farm on which were all the buildings, the father had relinquished his life estate on the lower half to Andrew; and that, although the same tenant occupied the whole farm, yet he, with the consent of Joseph, became the tenant of Andrew, as to the lower half, and to him paid his rent.

Andrew, who in the language of his uncle, as witnessed, was not well-doing man, offered his part for sale, to more than one person; and on the 22d of August 1834, entered into articles of agreement to convey it to the plaintiff below, Henry Frick. About the time of this agreement, Mr Frick called on the father, and mentioned the matter. The old gentlemen then, or soon after, objected, that 400 dollars of the price was to be satisfied by conveying some lots in Churchville. Frick agreed to change this, and pay the 400 dollars in money. It would seem, Frick called again on the old gentleman, and offered to give up the contract, if some money he had advanced, was repaid. Joseph Rhodes gave no notice of his claim, did not deny Andrew's right to sell, said Andrew would do as he pleased, would never have another place to sell, &c. &c. On the 10th of November 1834, the deed was made to Frick, who gave notice to Troxall, the tenant, to quit on the 1st of April 1835, and he refusing, this suit was brought. Frick paid more than half the purchase money, within six months of his purchase; and, as it would seem, before he was aware that any objection would be made. It would not be worth the labour, to insert all the testimony given in this case. This court cannot reverse because the verdict

may to us appear to be against the weight of evidence. Nor, as the cause may be again tried in another ejectment, brought by Joseph Rhodes, do I think it right to say any thing as to what appears to me to be the comparative weight of the evidence. We have the testimony on paper; we do not know the witnesses, nor their credibility; much is learned from seeing and hearing the witnesses; we have not that advantage.

The matters alleged as error in the court below are numerous, but are in fact but one: bills of exception were taken to the whole offer of the evidence of the plaintiff below, and to the parts of it; and the defendants requested the court to charge, that the evidence given did not make out a case on which the plaintiff could recover. The court received the evidence, and left the truth of the testimony and the conclusions to be drawn from it to the jury.

Where there is a court of chancery, the defendant answers the plaintiff's bill, which states the contract on which he claims: this answer of the defendant is on oath, and he is liable to indictment and conviction for perjury if he swears falsely. See 4 *Burr.* 2255; 4 *East* 572, 577, *note.* And in chancery the cause turns much on that answer. Here the defendant is not and cannot be examined; the contract must be made out by the testimony of disinterested witnesses; and I do not believe this is a defect in our administration of justice. If a case is, in the words of our acts of assembly, "not within the meaning of the act against frauds and perjuries," or of the last act, "the contract so far executed that it would be against equity to rescind the same," I am willing that the proof which makes it such a case, should come from those not interested; and that a person who has not reduced his contract to writing, should be required to prove that contract by competent testimony, But this, perhaps, increases the difficulty to the plaintiff in more respects than one; at least in some cases. If possession has been given, improvements made, or consideration paid, it is of itself evidence of some agreement; and admissions or declarations of the parties are often the only evidence of the nature and terms of that agreement. This brings before the court and jury many witnesses; and the cause often depends on the degree of credit to which they are severally entitled; and to decide on this is the peculiar province of the jury. In a court of chancery another difficulty sometimes arises; there is enough of testimony to prove there was some agreement, but the proof of the precise terms of that agreement is not so clear: and in former times, and perhaps still, there has been some contrariety of decision, or dicta at least, on this subject. At one time, it is said, there can be no decree for performance unless the terms are certain; at another, and this seems the better opinion, we find it referred to the master to ascertain the terms, or sometimes to a jury: and a decree is made by the most eminent chancellors, although the proof is contradictory. See 1 *Ver.* 221; 3 *Brown Ch.* 149, and 1 *Johns. Ch.* 273: reversed, 14 *Johns.* 15; at which see the opinion

delivered by Thompson, C. J., concurred in by Spencer, J., and a majority of the senate. See also Brown *v.* Dysinger, 1 *Rawle* 408. In this case Tod, J., dissented, but agreed to the general doctrine that certain facts take a case out of the statute, and that the judge was bound to admit the evidence.

The sum of the whole matter is contained in the answer of the court to the ninth and tenth points submitted by the defendant's counsel, which points required the opinion of the court on the whole case. The court say, "If the jury believe there was a parol partition by which the son conveyed the upper part to his father, and the father gave up all his right and possession in the lower part to the son, possession alone, in such case, is sufficient to take the case out of the statute; the conveyance of the remainder in fee by the son to the father is tantamount to the payment of the purchase money, if the jury find it formed the consideration of the partition. The court cannot instruct the jury: there is no evidence from which the jury can infer a partition of the two hundred acres, as requested in the ninth point. From the testimony of Jacob Kline, (who proved that, when he called on Joseph Rhodes in 1834 for the whole taxes, he paid one half and told him the other half belonged to his son, who was getting the produce of it, and he would not pay taxes for that part,) of R. Goodman, (who proved that in speaking of this farm Joseph said Andrew had sold his part; on which witness said, I thought that farm was yours as long as you lived; to which Joseph replied, I could have kept it if I wanted to,) of A. Witter, (who went with Andrew to his father to raise money, and when the father refused, Andrew said, if you will not buy my share I know who will; the father told Andrew he did not care what he did, he was going to destruction any how,)—from these the jury may infer a division between the father and son: from the testimony of Abraham Stroub, Joseph Hogendobler, John Sybert, Thomas Allen and George Berryman, the jury may find the possession of Andrew by the attornment and payment of rent by Troxall, the tenant, and from the testimony of Jacob Kline, Richard Goodman and William Tilman, the jury may find that attornment and payment of rent was known to Joseph Rhodes and assented to by him." The court then drew the attention of the jury to the testimony of the above witnesses, and of the witnesses for the defendant below, and refused to withdraw the cause from the jury, or to tell them there was no evidence on which they could find for the plaintiff; but left it to them to say, whether Joseph Rhodes, by parol, agreed to relinquish his interest for life in the lower half of the tract, to Andrew, put or permitted Andrew to go into possession of that part, and received from him a conveyance of the reversion in fee of the upper half, in consideration, among other things, of such giving up his life interest in the lower half.

There is another matter assigned as error: John Dicter proves that Frick, before the deed to him was executed, called on Joseph Rhodes,

[Rhodes v. Frick.]

told him he heard that a good deal was said about his purchase, and offered to give it up if what he had paid was refunded; (a small sum;) that Joseph said he took no part and would take no part in the matter; that something was said of the Churchville lots, which Frick took back and paid in money. And Witter proves, that Joseph, after this suit was brought, told him that Frick had called and offered to give up the purchase; that he was very dry, and did not give Frick much satisfaction; that after reflecting he had consulted an attorney, who advised him to stand a suit In commenting on this testimony the judge said, his silence on that occasion may be regarded as a circumstance adding strength to the other evidence, tending to show a division of the land, and that the father had given up all his interest in the premises then selling, to his son. And it is plain the judge would have gone further, but from his understanding of some late decisions of this court. The last I recollect is Jack *v.* Blair. Blair, who was married to a niece of Jack, had acquired the title to part of a lot in Kittanning, and applied, by a friend, to Jack, to purchase his interest. Jack positively refused to sell. Blair went on to build, and Jack saw the house during the time the workmen were building it, and did not give notice, and brought suit, and this court held he could recover. What use for notice to a man who had full knowledge, and yet obstinately went on to build? See also Robison *v.* Justice, 2 *Penns. Rep.* 17, and Kerr *v.* Alexander, 2 *Rawle* 83. I take the decision of this court to go this far, and no farther: I have my survey returned or my deed recorded: I hear that my neighbour is selling: it is not necessary that I should go to the purchaser and show my lines, or warn him not to buy my land: my title is of record, and my neighbour can give a purchaser no title to it. But it has not, I think, been decided, that if I am present, and see my neighbour show my land, or part of it, as his own, and see a purchaser buy and pay on that showing, that I can recover the part so shown and sold in my presence, and I concealing my claim. In the present case, the estate of Joseph Rhodes was tenancy by curtesy, his title not of record, but by operation of law: he was not in possession of this part; he was directly applied to by the purchasers before his deed or payment of money, except a small sum: he is silent as to any claim of his; gives no satisfaction; ponders on the matter; takes advice, and then waits till Frick had taken his deed and paid his money; and then, and not till then, asserts a title in himself. I know of no decision nor dictum which will justify such conduct. I do not put it on the case of Joseph hearing of Frick's purchase, but on the direct application to himself by Frick; his objecting to part payment in lots in Churchville; which, in consequence of his objection, was changed to payment in money. There is, says Lord Redesdale, 2 *Scho. & Le Froy* 66, an important difference between actual notice, and the operation of the register act: actual notice may bind the conscience; the operation of the register act may bind

[Rhodes v. Frick.]

the title, but not the conscience. A positive act, calculated to induce a man to purchase, may postpone the right in favour of such purchaser; 2 *Rawle* 89. Now the silence can hardly be called a positive act; yet silence, when a direct application is made by a person about to purchase, may have the same effect, especially if we take into view that by Joseph's interference the terms of purchase were changed, and money paid instead of lots in Churchville.

There was, then, no error in this part of the charge; or if there was, it consisted in not submitting the conduct of Joseph as having a greater effect in favour of Frick.

As to the duty and power of the court over the facts of the case, I shall only refer to a few of our own cases. 1 *Serg. & Rawle* 520. Tilghman, C. J., says: " When the court are called upon to declare what is the law upon the whole evidence, they are not bound to answer, because they cannot answer without deciding the facts. The court have no power to decide on the facts." And again: " No other than the jury can decide on the facts." In Jones *v.* Wilde, 8 *Serg. & Rawle* 150, the case was reversed because the court told the jury that the verdict must be for the defendant; and because the court gave a binding direction to the jury as to the facts; and see Galbraith *v.* Black, 4 *Serg. & Rawle* 210, and Sidwell *v.* Evans, 1 *Penns. Rep.* 385–6, where most of our cases are reviewed by Chief Justice Gibson.

In conclusion, it was not improper to submit it to the jury, whether great injustice would not be done by deciding against the plaintiff; and whether he might not be without remedy which would afford adequate compensation, 5 *Watts* 150; as it was admitted Andrew was insolvent.

Judgment affirmed.